283 So.2d 521 (1973)
NEW ORLEANS SHRIMP CO., INC., Plaintiff-Appellant,
v.
DUPLANTIS TRUCK LINES, INC., et al., Defendants-Appellees.
v.
EMPLOYERS LIABILITY ASSURANCE CO., INC., et al.
v.
Leroy CROCHET et al.
Nos. 9490, 9491.
Court of Appeal of Louisiana, First Circuit.
August 23, 1973.
*522 Eugene V. Callaway Bienvenu & Culver, New Orleans, for plaintiffs-appellants, Sea Ins. Co., Underwriters at Lloyds, London & Wash. Gen. Ins. Corp.
Robert D. Morvant, Thibodaux, for third party defendants and appellees, Ritchie Dragline Co., Inc., U. S. F. & G. Co., Houston Contracting Co., and Continental Cas. Co.
J. Walter Ward, Jr., New Orleans, for defendants-appellees Duplantis Truck Lines, Inc., Leroy J. Crochet, and Transit Cas. Co.
Before SARTAIN, BLANCHE and WATSON, JJ.
SARTAIN, Judge.
These consolidated suits arose out of an accident which occurred at approximately 9:30 A.M. on October 10, 1968 on Louisiana Highway One at Golden Meadow, Louisiana. At the time of the accident New Orleans Shrimp Co., Inc. (NOSCI) owned and operated an ice manufacturing and shrimp processing plant at Golden Meadow, Louisiana. The business was conducted in a building located on the western side of Louisiana Highway One. Bayou Lafourche parallels Louisiana Highway One. On the eastern side of the highway along the banks of Bayou Lafourche NOSCI maintained a loading dock and an *523 ice crushing machine located in a tower structure. A metal conveyor system extended from the main building on the western side of the highway to the ice crushing machine on the Bayou Lafourche side. The purpose of this conveyor system was to transport blocks of ice from the main building to the crusher in order that the ice might be crushed and then force sprayed into shrimp boats which docked there for the purpose of unloading their shrimp and taking on ice. The metal conveyor was built on a slant across the highway, having a height of fifteen feet eight inches at the point where it was connected to the main building and a height of fourteen feet eight inches at the point where it connected to the ice crusher.
On the morning of October 10, 1968, Leroy Crochet was driving a large tractor-trailer rig owned by his employer, Duplantis Truck Line, Inc., in a southerly direction on Louisiana Highway One. Loaded on the trailer was a marshbuggy, owned by Ritchie Dragline Co., Inc. and leased to Houston Contracting Co., which was being transported from Montegut, Louisiana to a point south of Golden Meadow, Louisiana. As the tractor-trailer passed under the metal conveyor system the upper portion of the marshbuggy came into contact with the conveyor, knocking it down and causing the damages sued for herein.
As a result of this accident the conveyor was totally destroyed. It was rebuilt at a cost of $10,090.84. NOSCI was insured for property damage loss by Employers' Liability Assurance Company, Inc., Insurance Company of North America, Northwestern Underwriters of Citizens Insurance Company and Phoenix Insurance Company. Pursuant to the terms of their respective policies each company paid to NOSCI the sum of $2,255.70 for a total of $9,022.80. As subrogees of the named insured these insurers filed suit (our number 9491) against Leroy Crochet, his employer, Duplantis Truck Line, Inc. and their liability insurer, Transit Casualty Company, seeking to recover the amounts paid to NOSCI. The defendants answered denying liability and asserting a third party demand against Ritchie Dragline Co., Inc., its insurer, United States Fidelity & Guaranty Company, Houston Contracting Co., and its insurer, Continental Casulaty Company, alleging that employees of the said third party defendants had assisted in the loading and securing of the marshbuggy and did so in a negligent manner. Third party defendants answered denying these allegations.
Another suit (our number 9490) was filed by NOSCI claiming a sum of $30,000.00 as damages for lost sales of ice and lost processing of shrimp for the period of some fifteen days during which time the conveyor was inoperable after the accident. Named as defendants in this suit were the Sea Insurance Company, Ltd., Underwriters at Lloyd's, London, and Washington General Insurance Corporation, the three business interruption insurers of NOSCI. Also named defendants were Leroy Crochet, Duplantis Truck Line, Inc. and Transit Casualty Company from whom NOSCI also sought recovery of the $1,068.02 deductible not recovered from its property damage insurers. The three business interruption insurers filed a third party demand against Leroy Crochet, Duplantis Truck Line, Inc. and Transit Casualty Company. Subsequent to the filing of this suit but prior to trial a settlement was entered into between NOSCI and its three business interruption insurers whereby the Sea Insurance Company, Ltd. paid $1,659.00, Underwriters at Lloyd's, London paid $5,111.00, and Washington General Insurance Corporation paid $3,250.00 for a total of $10,020.00 in satisfaction of the claims for lost profits asserted against them. The three business interruption insurers then supplemented their demand against Leroy Crochet, Duplantis Truck Line, Inc. and Transit Casualty Company to include a claim for the amounts paid, and NOSCI asserted the remainder of its claim in excess of the amounts it received from the *524 three insurers. Leroy Crochet, Duplantis Truck Line, Inc. and Transit Casualty Company answered denying liability and again third-partied Ritchie Dragline Co., Inc., United States Fidelity & Guaranty Company, Houston Contracting Co., and Continental Casualty Company, who likewise answered denying liability. The two suits were then consolidated for trial.
After trial on the merits judgment was rendered on the property damage claim in favor of the plaintiffs and against Leroy Crochet, Duplantis Truck Line, Inc. and Transit Casualty Company awarding each of the insurers the sum of $1,681.81 for a total of $6,727.22. No appeal has been taken from this portion of the judgment.
As to the claim for damages for lost profits, judgment was rendered in favor of the three business interruption insurers and against Leroy Crochet, Duplantis Truck Line, Inc. and Transit Casualty Company in the total sum of $5,010.00 payable in the amounts of $829.50 to the Sea Insurance Company, Ltd., $2,555.50 to Underwriters at Lloyd's, London, and $1,625.00 to Washington General Insurance Corporation. The claim of NOSCI for damages over and above that already paid by the three business interruption insurers was rejected, as was the claim for the deductible amount expended in repairing the property damage.
The trial court held that the proximate cause of the accident was the negligence of Leroy Crochet in approaching and attempting to pass under the conveyor without exercising the proper care and caution. The trial court also held that the sole responsibility for securing and transporting the marshbuggy rested with defendants and thus dismissed the third party demands filed against Ritchie Dragline Co., Inc., United States Fidelity & Guaranty Company, Houston Contracting Co. and Continental Casualty Company.
From this judgment the three business interruption insurers have appealed seeking an increase in the amount awarded for loss of profits and an award of expert witness fees for one of the witnesses who testified at trial. Leroy Crochet, Duplantis Truck Line, Inc. and Transit Casualty Company have answered the appeal asserting that the trial court erred in granting any award for lost profits and, in the alternative, that said award should be reduced. They also contend by their answer to the appeal that the trial court erred in rejecting the third party demand against Ritchie Dragline Co., Inc., Houston Contracting Co. and their respective insurers. The third party defendants have also filed an answer to the appeal asserting that the judgment of the trial court should be affirmed. No appeal has been taken nor answer to appeal filed on behalf of either NOSCI or its property damage insurers.
The issues presented are (1) whether the award for lost profits was proper, (2) whether the third party demand was properly rejected, and (3) whether an expert witness fee should be awarded for one of the witnesses who testified at trial.
Hereinafter, the Sea Insurance Company Ltd., Underwriters at Lloyd's, London, and Washington General Insurance Corporation will be collectively referred to as appellant; Leroy Crochet, Duplantis Truck Line, Inc. and Transit Casualty Company will be collectively referred to as appellees; and Ritchie Dragline Co., Inc., United States Fidelity & Guaranty Company, Houston Contracting Co. and Continental Casualty Company will be collectively referred to as third party defendants.

(1) THE AWARD FOR LOST PROFITS
The evidence adequately establishes that it was customary for various shrimp boats to dock at the NOSCI facility in Golden Meadow for the purpose of selling their catch of shrimp and to take on crushed ice in order to preserve their subsequent catch. The record also discloses that the ice conveyor system was inoperative for a period of fifteen working days following the accident on October 10, 1968. There was testimony *525 by Mr. Ernest L. Morales, the general manager of NOSCI in Golden Meadow, to the effect that due to the unavailability of crushed ice during the period that the conveyor was down many of the shrimp boats which normally called at the company's facilities decided to use other buyers where they could sell their shrimp and purchase ice at the same time. It is on this basis that the claim for loss of profits was made.
The trial court found that NOSCI did suffer some loss of profits during the fifteen day period but went on to hold that appellants had not proven the full amount claimed by the requisite degree of proof. On this basis the trial court exercised the discretion granted to it by law and assessed the loss at $5,010.00
Appellants assert that the trial court erred in holding that they had failed to prove the full loss claimed. Appellees, on the other hand, contend that the trial court erred in awarding any amount for the loss claimed or, alternatively, that it awarded an excessive amount.
While the usual standard of proof to a legal certainty is not required in proving lost profits resulting from an offense or quasi offense, it is well established that the loss must be proved with reasonable certainty and damages should not be allowed where the lost profits claimed are purely conjectural. Shreveport Laundries v. Red Iron Drilling Co., 192 So. 895 (2nd La.App. 1939) writ denied, January 9, 1940; Southern Television Electronics v. Read, 244 So.2d 624 (4th La.App. 1971), writ refused 258 La. 570, 247 So.2d 392 (1971).
Our review of this record and the various exhibits introduced in connection with this issue convinces us that the trial judge committed no manifest error in holding that the full extent of the loss claimed was not proven with reasonable certainty. In addition we are unable to find that the amount awarded for this item of damages was so excessive or inadequate as to amount to an abuse of the reasonable discretion vested in the trial court in assessing damages in cases where the amount of the loss cannot be exactly estimated. La.C.C.Art. 1934(3); Brantley v. Tremont & Gulf Railway Co., 226 La. 176, 75 So.2d 236 (1954); Jordan v. Travelers Insurance Company, 257 La. 995, 245 So.2d 151 (1971); Peoples Moss Gin Co., Inc. v. Jenkins, 270 So.2d 285 (3rd La.App.1972).
Therefore, we adopt with approval that portion of the written reasons for judgment by the judge a quo pertaining to this issue:
"The next item of damage claimed is loss profits during the 15 day period. This item is made up of 2 parts. First is for loss of profits from sale of ice to shrimp boats. The second is loss of profits from sale of shrimp due to the inability of NOSCI to acquire shrimp from boats that normally docked at its place of business. In an effort to prove these items plaintiffs introduced numerous purchase tickets, invoices and other records of NOSCI's operations at the Golden Meadow plant. These records cover a period of time from several weeks prior to the accident to several weeks subsequent to the conveyor system being replaced in operation. In addition thereto, several officers and employees of NOSCI testified and made projections and assumptions based on these exhibits. The law requires a plaintiff to prove his damages with some degree of certainty. After examining the testimony and exhibits the court is of the opinion that NOSCI did suffer some loss of profits during this 15 day period but also of the opinion that plaintiffs have not proven with any degree of certainty the full loss claimed by them. For instance, in regard to the ice sales there is testimony in the record that it was customary for certain shrimp boats to dock at NOSCI's place of business and purchase crushed ice from it. However, the record does not show how many boats normally *526 docked during a given period or how often each boat actually did dock at plaintiff's place of business and how much ice was actually purchased. The same is true in regards to the purchasing of shrimp by NOSCI. The record shows that NOSCI purchased shrimp for porcessing and resale from 2 sources. One source was from shrimp boats docking at its place of business. The other source was from dealers and other parties who delivered the shrimp to the plant by truck. An examination of the purchase tickets and other exhibits filed in the record would indicate that NOSCI did suffer a loss if the 15 day period in which the conveyor system was inoperative is compared with a like period immediately after the conveyor system was placed back in operation. On the other hand, if the 15 day period during which the conveyor system was inoperative is compared with a similar period immediately preceding the accident it appears that NOSCI was able to acquire and process approximately the same amount of shrimp during both periods. The court is fully aware of the fact that the shrimping business is a seasonal and highly speculative business and that it is extremely difficult to accurately determine or estimate profits for any one particular period during a given season. This is due to the numerous unknown factors involved such as weather conditions, tides, temperatures, etc., all of which affect the quantity of shrimp that will be caught on a given day or during a given period. Because of these variables and the record as it presently exists the court is of the opinion that plaintiffs have not proven the amount of loss claimed by them but have convinced the court that some loss of profits was suffered. In order to do justice to all parties the court feels that it should exercise the discretion granted to it and will render a judgment in the amount of $5,010.00 for loss of profits, see Bergeron v. Con-Plex, Inc., 255 So.2d 397 (La.App. 1st Circuit, 1971); Hayward v. Caraway, 180 So.2d 758 (La.App. 1st Circuit 1965); said amount to be paid in the sum of $829.50 to The Sea Insurance Carraway, 180 So.2d 758 (La.App. 1st ers at Lloyd's, London, and $1,625.00 to Washington General Insurance Corporation."

(2) THE THIRD PARTY DEMAND
Appellees assert that the trial court erred in rejecting their third party demand against Ritchie Dragline Co., Inc., Houston Contracting Co., and their respective insurers. Appellees contend that third party defendant's employee, Mr. Joseph Brunet, aided in securing the marshbuggy to the trailer and was negligent in doing so.
The trial court determined that the sole cause of the accident was the negligence of Leroy Crochet and that third party defendants were in no way responsible for securing or transporting the load. It was on this basis that the claim against third party defendants was dismissed.
Concerning the accident Mr. Adam Gisclair, an employee of NOSCI who witnessed the accident from the office porch, testified that he saw the police escort pass by the office window and went out on the porch to observe the oncoming truck. He stated that he saw the truck passing by the office at what he considered to be too rapid a rate of speed and he yelled at the driver to slow down. At this point the driver put on his air brakes. Apparently this braking maneuver caused the load to rise and thus strike the conveyor.
The testimony of Mr. Gisclair and the testimony of Officer Gerald A. Guidry, the police escort, indicates that the "A" frame or gin pole of the marshbuggy was the portion of the load which came into contract with the conveyor as the truck attempted to pass under it.
The only evidence in the record pertaining to the loading and securing of the marshbuggy was the testimony of Mr. Leroy Crochet, the Duplantis Truck Line, Inc. *527 driver, and the testimony of Mr. Joseph Brunet, the marshbuggy driver employed by third party defendants.
Mr. Crochet testified that he was dispatched on the morning of October 10, 1968 to the Montegut site to pick up the marshbuggy and transport it to a new site below Golden Meadow, Louisiana. When he arrived at the Montegut site with the tractor-trailer rig he lowered the float on the trailer and instructed Mr. Joseph Brunet, the marshbuggy driver, to drive the buggy onto the float. Mr. Crochet guided Brunet onto the trailer and instructed him where to stop the buggy. Mr. Crochet testified that he did not ask the marshbuggy driver to assist him in chaining and securing the marshbuggy to the trailer. Mr. Crochet stated that he secured the marshbuggy to the trailer with chains but he did not loop one of the chains over the "A" frame or gin pole assembly. He stated that the "A" frame or gin pole was down at the time he left the Montegut site. Mr. Crochet testified unequivocally that the securing of the load was his job and his responsibility. He also stated that he had the authority to refuse to take the load onto the highway until he was satisfied that it was properly loaded and secured.
Mr. Crochet stated that he was familiar with the route he was to take that morning and knew that the conveyor ran across the highway in Golden Meadow. He testified that he was traveling at a speed of about 25 m. p. h. as he approached the conveyor in an effort to catch up with his police escort and he did not slow down or stop to see if he had enough clearance to pass under the conveyor. Just as he was about to pass under the conveyor he heard someone yell at him and he jammed on his air brakes causing the load to rise, thus making contact with the conveyor.
Mr. Joseph Brunet testified that he was the driver of the marshbuggy owned by Ritchie Dragline Co., Inc. and leased to Houston Contracting Co. Mr. Brunet stated that when the tractor-trailer rig arrived to pick up the marshbuggy Mr. Crochet lowered the float and directed him as he drove the buggy up onto the trailer. Mr. Crochet told him where to stop the marshbuggy and raised the float. Mr. Brunet stated that he lowered the canopy and "A" frame to a height approved by Mr. Crochet. Brunet then got off of the trailer and left the area. Mr. Brunet testified that Crochet did not ask him to secure the marshbuggy and he did not help Crochet do this. Brunet did not follow the tractor-trailer to Golden Meadow and knew nothing of the accident until later that day.
In view of the testimony of Mr. Crochet that the securing of the load was his sole responsibility and that no one else helped him secure it, we agree with the trial court in rejecting the third party demands. Even if there were some evidence to establish that an employee or employees of the third party defendants participated in securing the marshbuggy to the trailer such action cannot be seen as the proximate cause of the accident. As correctly determined by the judge a quo, the actions of Mr. Leroy Crochet in approaching the conveyor at a speed of 25 m. p. h. and attempting to pass under it without slowing down or taking any other precautionary actions to determine if there was enough clearance to do so safely, amounted to negligence on his part which was the proximate cause of this accident.
Appellees argue that since Mr. Brunet lowered the "A" frame or gin pole on the marshbuggy after driving it onto the trailer and inasmuch as this was apparently the only portion of the load which struck the conveyor, then this was sufficient evidence to shift the burden of proof to the third party defendants under the doctrine of res ipsa loquitur to exculpate themselves from a presumption of negligence on the part of their employee. Appellees contend that since such proof was not forthcoming the third party demand should not have been rejected.
*528 In support of this contention appellees cite the cases of Landry v. News-Star-World Publishing Corporation, 46 So.2d 140 (2nd La.App. 1950) and Saunders v. Walker, 229 La. 426, 86 So.2d 89 (1956). We find these cases and the doctrine of res ipsa loquitur inapplicable to the case at bar.
In the Landry case an awning contractor had erected a scaffolding with an iron pipe safety rail. A portion of the safety rail fell and struck a passerby. In applying the doctrine the court there found that the safety rail would not have fallen except for some negligent act or omission chargable to the awning contractor whose employees were charged with the responsibility of handling and installing the instrumentality whch caused the injury. In the case at bar, at the time of securing the load to the trailer and at the time of the accident the appellees and not the third party defendants were charged with the sole responsibility and exclusive control of the instrumentality which caused the damage.
In the Saunders case a contractor used a certain hose or tubing in the installation of a heating and cooling system. The tubing later proved defective causing damage to the plaintiff's home. The court found that if the rubber tubing had been properly installed it would not have leaked and caused the damage to the home. In the case at bar had Mr. Crochet, who testified it was his sole responsibility to secure the load, properly chained the marshbuggy to the trailer, the "A" frame or gin pole might not have struck the conveyor.

(3) EXPERT WITNESS FEE
Appellants assert that an expert witness fee should be taxed as costs of court for the testimony of Mr. O. W. Ecuyer, who testified at the trial as an expert in the field of accounting. The trial court rendered judgment in favor of appellants and against appellees for all costs of the proceedings but no specific award was made for the costs attributable to having the accountant testify. On appeal, appellants seek a specific award of $665.00 for the expert witness fee of this witness. In addition thereto, appellants claim that an additional award of $437.50 should be made in their behalf for the cost of preparation of the transcript, said amount to also be taxed as costs.
In failing to specify an award for the expert fee attributable to Mr. Ecuyer the trial judge either inadvertently overlooked the same or presumed that appellants would follow the provisions of L.R.S. 13:3666 which provides for compensation of expert witnesses which may be determined by rule after a judgment has become final.
We prefer not to award an amount for compensation attributable to Mr. Ecuyer but to reserve unto appellants the right to proceed by rule pursuant to L.R.S. 13:3666 and to have the trial judge fix the same after he has had an opportunity to determine what portion of this witness's bill pertains to the instant claim for loss of profits and what portion thereof is attributable to appellant's settlement with its business interruption insurers. See Watson v. Car Shop., Inc., 237 So.2d 712 (4th La.App. 1970).
However, the sum of $437.50 for the cost of the transcript is another matter. The record reveals that this case was tried on the merits on September 22, 1971. Written reasons for judgment were assigned by the trial court on December 1, 1972. The testimony itself was not transcribed until April 16, 1973, and then for the purpose of completing the record for appeal. Inasmuch as we have affirmed the judgment of the trial court, appellant is responsible for all costs incidental to this appeal, which includes the cost of the transcript.
Accordingly, for the above reasons, the judgment of the District Court is affirmed, reserving unto appellants the right to proceed by rule to fix the expert witness fee of Mr. Ecuyer, together with all other *529 costs incurred in the District Court not incidental to this appeal. The costs attributable to this appeal are to be borne by appellants.
Affirmed.